IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

RENEWALMD, PC,

    Plaintiff,

v.

JOEL SHANKLIN, MD,

    Defendant.

CIVIL ACTION NO.: 4:21-cv-184

**O R D E R**

This matter comes before the Court on Plaintiff's Motion for Default Judgment. (Doc. 33.) For the reasons below, the Court **GRANTS** Plaintiff's Motion. (Id.)

**BACKGROUND**

Plaintiff RenewalMD, PC, (hereinafter "Renewal") filed this action against Defendant Joel Shanklin, M.D., (hereinafter "Shanklin") on June 18, 2021. (Doc. 1.) In its Amended Complaint, Renewal alleges that Shanklin has breached a contract by failing to pay amounts due and owing on a contract. (Doc. 20, p. 4.)

Renewal originally formed and operated as Coastal Empire Plastic Surgery, PC. On June 9, 2013, the then existing shareholders in the Company, Shanklin, Luke Curtsinger, Meghan McGovern, and Micheal Huntly entered an Amended and Restated Shareholders Agreement ("the Shareholders Agreement"). (Doc. 20-2.) The Shareholders Agreement established that the four physicians were equal shareholders in the Company. (Id. at p. 2.) The agreement's Shareholder Compensation Formula provided that "[i]t is accepted by all Shareholder physicians that certain corporate expenses will be shared equally." (Id. at p. 12.) The formula then specified the

allocation of various categories of expenses. (Id. at pp. 13—15.) Pertinently, the shareholders agreed to share equally a broad category of "General Overhead" expenses. (Id. at p. 14.) On June 1, 2018, the company changed its name to RenewalMD, PC. (Doc. 20-1.)

Before July 31, 2019, Curtsinger disassociated from Renewal, and a dispute arose about that disassociation. (Doc. 20, p. 2.) Curtsinger sued Renewal, Shanklin, McGovern, Huntly, and others in the Superior Court of Chatham County. (See doc. 20-8, p. 5.) The defendants in that action (including Shanklin and Renewal) entered into a Settlement Agreement and Mutual Release (hereinafter the "Settlement Agreement") through which they jointly agreed to pay Shanklin a total of $[redacted] in return for a release of liability and redemption of Curtsinger's interest in Renewal.[1] (Id. at p. 7.) Renewal paid the entire settlement amount to Curtsinger by booking a debt of $[redacted] to both McGovern and Huntley and thereby causing McGovern and Huntley to each pay $[redacted] to Curtsinger. (Doc. 20-7, p. 4.)

On July 31, 2019, before execution of the Settlement Agreement, Shanklin also disassociated with Renewal and sold his interest in Renewal to McGovern through a Stock Transfer Agreement ("the Stock Transfer Agreement"). (Id. at p. 3.) As part of that agreement, Shanklin agreed to pay his share of liabilities for Renewal's debts that arose before the stock

---

[1] The Court has sealed the Settlement Agreement because it contains a confidentiality agreement. (Doc. 7.) The Court must recount some of the information contained within the Settlement Agreement to rule on the Motion for Default Judgment. To balance the need for the agreed-upon confidentiality and the public's right to access, the Court has prepared a version of this Order which redacts any information that warrants protection from public view. Primarily, the redactions protect the amount paid under the Settlement Agreement. Additionally, to prevent that amount from being evident by simple subtraction, the Court has redacted other amounts owed by Shanklin to Renewal. The version of this Order with those redactions will be filed on the public docket, and an unredacted version of this Order will be filed in a restricted manner, with access restricted to only the Court and the parties. That said, the total amount of judgment against Shanklin in this lawsuit will be included in this Order and the judgment entered by the Clerk of Court.

transfer, which the parties labeled "Pre-Assignment Obligations." (Doc. 20-4, p. 2.) Shanklin and McGovern agreed that,

> [w]ithout limitation, the Pre-Assignment Obligations include all obligations regarding reversals, chargebacks, and penalties (whether claimed by insurers or any other person or entity), claims against distributions made by the Company to Shanklin prior to the Assignment Time, and obligations relating to claims made by Dr. Luke Curtsinger against the Company (the "Curtsinger Matter"), as if Shanklin still owned Shanklin's Shares and as if Shanklin retained his status as a shareholder of the Company. In furtherance of the foregoing, Shanklin hereby agrees to indemnify the Company and its shareholders against, or otherwise contribute Shanklin's portion in respect of, Pre-Assignment Obligations, with Shanklin's portion being one-third in the case of the Curtsinger Matter . . . .

(Id.) Renewal alleges that "[i]t was the understanding and contractual agreement of Dr. McGovern, Dr. Shanklin, and [Renewal] that Dr. Shanklin would pay 1/3 of the total settlement fees and expenses, including attorneys' fees, arising from the Curtsinger Matter, and that understanding is mirrored in the Stock Transfer Agreement." (Doc. 20, p. 3.) Renewal also asserts that it "was a third-party beneficiary of the Stock Transfer Agreement's provisions which specified that Dr. Shanklin retained responsibility for pre-assignment obligations, including those connected to the Curtsinger matter." (Id.) Renewal claims that Shanklin owes it his share of the Curtsinger settlement, $▓▓▓▓, plus his share of the legal fees Renewal incurred in the Curtsinger dispute, $▓▓▓▓, for a total principal indebtedness of $▓▓▓▓. (Doc. 20-7, p. 4.) Renewal demanded that Shanklin pay this debt, but Shanklin refused to do so. (Doc. 20, pp. 4—5.)

In Count I of its Amended Complaint, Renewal asserts a claim for breach of contract against Shanklin, based on his failure to pay the indebtedness memorialized in the Stock Transfer Agreement. (Id. at pp. 5–6.) In Count II, Renewal seeks to also recover prejudgment interest under O.C.G.A. § 7-2-4 for the simple interest accrued (at the statutory rate of 7% per year) since the demand for payment was made to Shanklin on or before February 26, 2020. (Id. at p. 6.)

3

Finally, in Count III, Renewal seeks to recover attorneys' fees and costs under O.C.G.A. §§ 13-6-11 and 9-15-14 because it "has expended time and effort attempting to contact Dr. Shanklin and in requesting that he pay amounts due and owing" but he has "offered no good faith excuse for his failure to pay." (Id. at p. 7.) Renewal asserts that Shanklin's actions have been "stubborn, litigious, and have no good-faith explanation," and that, because of Shanklin's actions, Renewal has "been forced to retain [an attorney] to attempt to pursue the amount due and owing, including by initiating and prosecuting this lawsuit." (Id. at pp. 5–6.) The Original Complaint was verified by McGovern. (Doc. 1-3.)

Shanklin was personally served with a summons and the Complaint on July 20, 2021. (Doc. 9.) Yet Shanklin never filed an answer and has failed to otherwise appear. Thus, Renewal moved for a clerk's entry of default, (doc. 10), and the Clerk of Court granted that request, (doc. 11). Renewal then filed a Motion for Default Judgment, (doc. 12), which the Court denied without prejudice, (doc. 18). Renewal then filed an Amended Complaint to remedy the deficiencies noted in the Court's prior Order. (Doc. 20.) Shanklin was personally served with the Amended Complaint on January 20, 2023. (Doc. 26.) However, he never filed an Answer or otherwise responded, and the Clerk entered his default on May 15, 2023. (Doc. 30.) Renewal then filed the instant Motion for Default Judgment. (Doc. 33.)

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 55 establishes a two-step procedure for a party to obtain a default judgment. First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Second, after receiving the clerk's

4

default, the court can enter a default judgment provided the defendant is not an infant or incompetent. Fed. R. Civ. P. 55(b)(2). The clerk's entry of default does not automatically warrant entry of default judgment. "[T]hree distinct matters emerge as essential in considering any default judgment: (1) jurisdiction; (2) liability; and (3) damages. Before the Court can grant plaintiff's motion for default judgment, all three must be established." Pitts ex rel. Pitts v. Seneca Sports, Inc., 321 F. Supp. 2d 1353, 1356 (S.D. Ga. 2004). Thus, "before entering a default judgment for damages, the district court must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought." Tyco Fire & Sec., LLC v. Alcocer, 218 F. App'x 860, 863 (11th Cir. 2007); see also Eagle Hosp. Physicians v. SRG Consulting, 561 F.3d 1298, 1307 (11th Cir. 2009). In assessing liability, the Court must employ the same standard as when addressing a Rule 12(b)(6) motion to dismiss for failure to state a claim. Surtain v. Hamlin Terrace Found., 789 F.3d 1239, 1245 (11th Cir. 2015) ("Conceptually, then, a motion for default judgment is like a reverse motion to dismiss for failure to state a claim.").

Once the Court determines that default judgment should be entered, it then turns to the question of the type and amount of damages. Pitts, 321 F. Supp. 2d at 1356. Even when the Court finds that default judgment is appropriate, it must make certain "that there is a legitimate basis for any damage award it enters[.]" Anheuser-Busch, Inc. v. Philpot, 317 F.3d 1264, 1266 (11th Cir. 2003); see also Faria v. Lima Inv. Sols. LLC, No. 6:19-CV-535-ORL-37GJK, 2019 WL 3044033, at *2 (M.D. Fla. June 24, 2019), report and recommendation adopted, No. 6:19-CV-535-ORL-37GJK, 2019 WL 3037796 (M.D. Fla. July 11, 2019) ("Unlike well-pleaded allegations of fact, allegations relating to the amount of damages are not admitted by virtue of default; rather, the court

5

must determine both the amount and character of damages."). Further, as the Eleventh Circuit Court of Appeals explained, "despite Rule 55's permissive language, judgment of default awarding cash damages [cannot] properly be entered without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation." Organizacion Miss Am. Latina, Inc. v. Urquidi, 712 F. App'x 945, 948 (11th Cir. 2017) (internal quotations omitted).

## DISCUSSION

**I.  Jurisdiction**

**A.  Subject Matter Jurisdiction**

Plaintiff's claims fall squarely within this Court's diversity subject matter jurisdiction set forth in 28 U.S.C. § 1332. Renewal alleges that Shanklin is a citizen and resident of Florida and was a citizen of resident of Ohio when this suit was filed. (Doc. 20, p. 1.) Renewal is a Georgia professional corporation with a principal place of business in Georgia. (Id.) Additionally, Renewal's sole shareholder is Dr. McGovern, who is a Georgia citizen and resident. (Id.) Accordingly, the Amended Complaint establishes complete diversity of citizenship between the parties. The amount in controversy requirement is met as Renewal asserts that it is entitled to more than $75,000 because of Shanklin's breach of contract ($███████ before interest and fees).

**B.  Personal Jurisdiction**

The Court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." Odyssey Marine Expl., Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 727 F. Supp. 2d 1341, 1345 (M.D. Fla. 2010); see also Geodetic Servs., Inc. v. Zhenghzou Sunward Tech. Co., No. 8:13-CV-1595-T-35TBM, 2014 WL 12620804, at *2 (M.D. Fla. Apr. 4, 2014) ("A default judgment is void in the absence of the Court's personal jurisdiction

over the defendant . . . ."). On this front, Renewal alleges that Shanklin "conducted business in Georgia for many years while residing in the state, entered [into] the subject contract in Georgia, the subject contract was to be performed in Georgia, and Shanklin's breach directly affected a Georgia entity." (Doc. 20, p. 1.)

The Court can exercise personal jurisdiction over Shanklin only if doing so complies with Georgia's long-arm statute and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1257–58 (11th Cir. 2010) (quoting United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009)). The Georgia long-arm statute, O.C.G.A. § 9-10-91, does not grant jurisdiction that is "coextensive with procedural due process," and "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." Id. at 1259 (citing Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa, 620 S.E.2d 352 (Ga. 2005)). Thus, the Court must apply the "specific limitations and requirements of O.C.G.A. § 9-10-91 literally and must engage in a statutory examination that is independent of, and distinct from, the constitutional analysis to ensure that both, separate prongs of the jurisdictional inquiry are satisfied." Id. at 1263. If the long-arm statute's requirements are satisfied, the Court then determines whether the exercise of jurisdiction comports with federal due process.

Among other things, the Georgia long-arm statute permits the exercise of jurisdiction over a nonresident who, personally or through an agent, transacts business within Georgia. O.C.G.A. § 9-10-91(1). In determining whether jurisdiction can be exercised over a nonresident defendant under subsection (1) of the Georgia long-arm statute, the Supreme Court of Georgia has stated:

> 'jurisdiction exists on the basis of transacting business in this state if (1) the nonresident has purposefully done some act or consummated some transaction in

> this state, (2) [] the cause of action arises from or is connected with such act or transaction, and (3) [] the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice.'

Amerireach.com, LLC v. Walker, 719 S.E.2d 489, 496 (Ga. 2011) (quoting Aero Toy Store v. Grieves, 631 S.E.2d 734, 737 (Ga. Ct. App. 2006)). The first two factors determine whether "a defendant has established the minimum contacts with the forum state necessary for the exercise of jurisdiction," and, if those minimum contacts exist, the third element determines whether the exercise of jurisdiction "does not result solely from random, fortuitous or attenuated contacts." Paxton v. Citizens Bank & Tr. of W. Ga., 704 S.E.2d 215, 219 (Ga. Ct. App. 2010). Physical presence in the state is not a requisite for jurisdiction under this subsection, and "Georgia allows the assertion of long-arm jurisdiction over nonresidents based on business conducted through . . . Internet contacts." Id. (quoting ATCO Sign & Lighting Co. v. Stamm Mfg., 680 S.E.2d 571, 576 (Ga. Ct. App. 2009)). The ultimate question is whether the defendant engaged in conduct directed at Georgia and could "fairly be said" to have literally "transacted" business in the state of Georgia. Diamond Crystal Brands, Inc., 593 F.3d at 1264; see also id. at 1264 n.18 ("'Transact' means 'to prosecute negotiations,' to 'carry on business,' 'to carry out,' or 'to carry on.'") (quoting Webster's Third New Int'l Dictionary 2425 (1993)).

Shanklin purposefully transacted business in Georgia. He lived in Georgia and was an equal and active shareholder in Renewal, a Georgia corporation. In that capacity, he practiced medicine in the state and participated in the company's affairs. He also entered into agreements in Georgia through which he agreed to take certain actions in the state and took on obligations for the operation of Renewal in Georgia. The Court easily finds that Shanklin transacted business in Georgia. Moreover, Plaintiff's Complaint directly arises from those transactions. As a result, exercising jurisdiction over Shanklin is appropriate under Georgia's long-arm statute.

Turning to step two of the personal jurisdiction analysis, the Due Process Clause of the Fourteenth Amendment allows for two types of personal jurisdiction, "general" and "specific." See Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 923–24 (2011). General personal jurisdiction arises where "continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against [the corporation] on causes of action arising from dealings entirely distinct from those activities." Id. (quoting Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement, 326 U.S. 310, 326 (1945) (first alteration in original)). On the other hand, specific personal jurisdiction arises based on a party's contacts with the forum state that are related to the cause of action. Id.; see also Helicopteros Nacionales de Colombia, N.A. v. Hall, 466 U.S. 408, 414 nn.8 & 9 (1984); Cable/Home Commc'n Corp. v. Network Prods., Inc., 902 F.2d 829, 857 n.41 (11th Cir. 1990). Because general jurisdiction is based on activity unrelated to a particular cause of action, the "due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction." Consol. Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1292 (11th Cir. 2000). Under the more exacting general jurisdiction standard, due process requires that a defendant's "affiliations with the State [be] so 'continuous and systematic' as to render [it] essentially at home in the forum State." Daimler AG v. Bauman, 571 U.S. 117, 139 (2014) (quotation and citation omitted). For either general or specific jurisdiction to comport with due process, the defendant must have certain minimum contacts with the state, and "[t]he minimum contacts inquiry focuses on 'the relationship among the defendant, the forum, and the litigation.' This inquiry ensures that a defendant is haled into court in a forum state based on the defendant's own affiliation with the state, rather than the 'random, fortuitous, or attenuated' contacts it makes by interacting with other persons affiliated

with the state." Waite v. All Acquisition Corp., 901 F.3d 1307, 1312 (11th Cir. 2018) (quoting Walden v. Fiore, 571 U.S. 277, 284 (2014)) (internal citations omitted).

In this case, the Amended Complaint establishes specific jurisdiction over Shanklin. To assess specific jurisdiction, the Court must apply a "three-part test." Waite, 901 F.3d at 1313 (citing Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1355 (11th Cir. 2013)). The Court must weigh: (1) whether Renewal's claim arises out of or relates to the nonresident defendant's contacts with Georgia; (2) whether Shanklin purposely availed himself of the privilege of conducting activities in Georgia; and (3) whether exercising jurisdiction comports with traditional notions of fair play and substantial justice. Id.

Plaintiff's claims arise out of and relate to Shanklin's contacts with Georgia. Plaintiff claims that Shanklin breached his obligations arising out of his ownership and participation in Renewal, a Georgia corporation. These facts establish a "direct causal relationship between the defendant[s], the forum, and the litigation." Louis Vuitton Malletier, 736 F.3d at 1355–56. Further, Plaintiff has sufficiently alleged that Shanklin has sufficient contacts with Georgia such that he has purposely availed themselves of the privilege of conducting activities within the state. As laid out above, Plaintiff's claims relate to Shanklin's contacts with Georgia—his ownership of, participation in, and promises to, a Georgia entity that operated a medical practice in Georgia. Further, Shanklin purposely availed himself of the privilege of doing business in Georgia by forming and owning a Georgia corporate entity, by using that entities to own and operate a medical practice, and by contracting with others to guarantee the performance of contractual obligations in Georgia. Thus, Shanklin had sufficient minimum contacts with Georgia, and those contacts related to Plaintiff's claims.

Ordinarily, the burden would now shift to the non-resident defendant to present a "compelling case" that exercising jurisdiction over them would violate traditional notions of fair play and substantial justice.  Louis Vuitton Malletier, 736 F.3d at 1355.  But because Shanklin has defaulted, he has not made any such arguments.  All the same, the Court has considered the following:

> (a) the burden on the defendant, (b) the forum State's interest in adjudicating the dispute, (c) the plaintiff's interest in obtaining convenient and effective relief, (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and ([e]) the shared interest of the several States in furthering fundamental substantive social policies.

Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1251 (11th Cir. 2000) (citing Burger King v. Rudzewicz, 471 U.S. 462, 466 (1985)).  Having weighed each of these factors, the Court finds that exercising jurisdiction over Shanklin would not violate traditional notions of fair play and substantial justice.

## II. Liability and Damages

### A. Count I Breach of Contract

For Renewal to recover any of the requested types of relief, the well-pleaded allegations must establish that Shanklin is liable to Renewal for breach of the at-issue contract.  The elements of a breach of contract claim in Georgia[2] are "(1) a valid contract; (2) material breach of its terms;

---

[2]  Because this Court is sitting in diversity, it applies the choice-of-law rules of the forum state (i.e., Georgia).  See Nat'l Fire Ins. of Hartford v. Thrasher Contracting, 142 F. Supp. 3d 1309, 1312 n.1 (N.D. Ga. 2015).  In the context of contracts, Georgia follows the *lex loci contractus* doctrine.  See id.  This case involves contracts executed in Georgia that concerned a corporation and individuals operating out of Georgia, and the contracts themselves state that the law of Georgia shall be the governing law in applying and interpreting them.  (Doc. 20, pp 2—4.)  Accordingly, the Court applies Georgia law.  See Thrasher Contracting, 142 F. Supp. 3d at 1312 n.1 (applying Georgia law where it "appears all of the contracts in this case were both formed and performed—or at least *intended* to be performed—in Georgia") (emphasis in original).

and (3) damages arising therefrom." Brooks v. Branch Banking & Tr. Co., 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015).

As described in the Background Section, supra, Renewal specifically asserts that Shanklin is liable for breaching an agreement he made in the Stock Transfer Agreement "to pay his share of liability for the Curtsinger Settlement, as well as to pay his 1/3 share of the attorneys' fees incurred in defending the Curtsinger Matter." (Doc. 20, p. 3.) In its prior Order denying default judgment, the Court noted apparent inconsistencies between this allegation and the documents Renewal attached to its Complaint. Renewal has explained those inconsistencies through its Amended Complaint and Motion for Default Judgment.

Reading the Shareholders Agreement, Stock Transfer Agreement, and Settlement Agreement together, Shanklin agreed to pay his portions of the Curtsinger settlement and fees associated with the Curtsinger dispute. Through the Shareholders Agreement, Shanklin agreed to pay his pro rata share of Renewal's general expenses, and Renewal has plausibly alleged that the expenses incurred to litigate and resolve the Curtsinger matter fell within that obligation. Moreover, through the Stock Transfer Agreement, Shanklin agreed to "indemnify [Renewal] and its shareholders against, or otherwise contribute Shanklin's portion in respect of, Pre-Assignment Obligations, with Shanklin's portion being one-third in the case of the Curtsinger Matter." (Doc. 20-4, p. 2.) The Court noted in its prior Order denying Renewal's first Motion for Default Judgment that Renewal was not a party to the Stock Transfer Agreement. (Doc. 13, pp. 7—8.) In response, Renewal plausibly alleged in its Amended Complaint that it is a third-party beneficiary to that agreement. (Doc. 20, p. 3.)

"The beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." OCGA § 9–2–20(b).  "The remedies available to the beneficiary are exactly the same as would be available to [it] if [it] were a contractual promisee of the performance in question." Reaugh v. Inner Harbour Hosp., Ltd., 447 S.E.2d 617, 620 (Ga. App. 1994).  That said, "it is essential to identify the specific contractual promises, if any, of which [a third party beneficiary] was an intended beneficiary, and [its] rights as an intended beneficiary attach only to those promises." Archer W. Contractors, Ltd. v. Est. of Pitts, 735 S.E.2d 772, 778 (Ga. 2012).  The parties to the Stock Transfer Agreement intended for Renewal to directly benefit from Shanklin's promises in the Agreement.  This is particularly evident as to his promise to pay his pre-assignment obligations including his share of the expenses incurred to litigate and resolve the Curtsinger dispute.  He agreed to indemnify Renewal directly for those expenses and to pay those obligations as if he were still a contributing shareholder of the company.  Accordingly, Renewal can seek the same remedies for Shanklin's breach of those promises as if Shanklin made those promises to Renewal.

Renewal has also plausibly alleged that Shanklin breached his promises memorialized in the Shareholder Agreement and Stock Transfer Agreement to pay his share of the Curtsinger settlement and fees.  Shanklin was clearly aware of the amount owned to Curtsinger as he was a party to the Settlement Agreement.  Renewal demanded that Shanklin pay his portion of the settlement amount and fees, and he has failed to do so.  Additionally, Renewal has asserted, without dispute, that the parties contemplated that Shanklin would pay his portion of the Curtsinger settlement and fees directly after the Settlement Agreement was finalized.  Though the Shareholder Agreement and Stock Transfer Agreement did not contain a timing provision, this period is

13

reasonable given the documents and undisputed allegations before the Court. Parker v. Futures Unlimited, Inc., S.E.2d 99, 99 (Ga. App. 1981) ("If no time is specified for performance, performance is due immediately or within a reasonable time after the contract is made.").

The Amended Complaint also plausibly alleges that Renewal suffered damages because of Shanklin's breach of the Shareholder Agreement and Stock Transfer Agreement. To be sure, McGovern and Huntley each paid $▮ to Curtsinger. (Doc. 20, p. 4.) That said, Renewal asserts that it was the ultimate source of this funding as it booked a debt of $▮ to McGovern and Huntley. (Id.)

Having found that Renewal is entitled to judgment as to liability for Shanklin's breach of contract, the Court also finds that no further proof is necessary regarding the amount of damages resulting from that breach. Ordinarily, unless a plaintiff's claim against a defaulting defendant is for a sum certain, the law "requires the district court to hold an evidentiary hearing" to fix the amount of damages. S.E.C. v. Smyth, 420 F.3d 1225, 1231 (11th Cir. 2005). Yet no hearing is needed "when the district court already has a wealth of evidence from the party requesting the hearing, such that any additional evidence would be truly unnecessary to a fully informed determination of damages." Id. at 1232 n. 13. The Court has all the relevant evidence necessary to consider Renewal's damages, and those damages are "a liquidated sum or one capable of mathematical calculation." Organizacion Miss Am. Latina, Inc., 712 F. App'x at 948. As laid out above, Renewal's allegations and the documents attached to the Amended Complaint establish that Renewal paid $▮ to settle the Curtsinger matter, and Shanklin's share of that payment is $▮. Renewal also paid $▮ in legal fees to litigate the Curtsinger dispute, and Shanklin's share of that expense $▮.

For all these reasons, the Court fins that Shanklin is liable to Renewal in the amount of $_____ for Shanklin's breach of contract as stated in Count I.

### B. Count II Prejudgment Interest

In entering default judgment, a district court may also award per diem interest. See <u>Wells Fargo Bank, Nat. Ass'n v. Columbia Hardwoods & Floors, Inc.</u>, No. CV 112-004, 2013 WL 8523, at *4 (S.D. Ga. Jan. 7, 2013) (awarding accrued interest). Applying O.C.G.A. § 7-4-2(b)'s statutory rate of 7% per year to the principal of $_____, interest has accrued at a rate of $____ per diem since Renewal's demand to Shanklin on February 26, 2020. (Doc. 20-7, p. 6.) The Court agrees that Plaintiff is entitled to interest, and it agrees with Plaintiff's calculation. Accordingly, the Court finds that Shanklin is liable to Renewal in the amount of $____ per diem for every day from February 26, 2020, to the date of this Order. This award of interest totals $_____.

### C. Count III Attorneys' Fees

Plaintiff has also established that it has a right to default judgment on its claim for attorneys' fees and expenses. The relevant statute provides:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

O.C.G.A. § 13-6-11. Under Georgia law, "if a plaintiff in its original complaint puts the defendant on notice that it is seeking attorney fees and expenses under O.C.G.A. § 13-6-11 as part of the relief prayed for in the case, and if a default judgment is subsequently entered against the defendant for failing to answer the complaint, then the plaintiff is entitled to an award of attorney fees and expenses as a matter of law." <u>Water's Edge Plantation Homeowner's Ass'n, Inc. v. Reliford</u>, 727 S.E.2d 234, 237 (Ga. Ct. App. 2012); <u>see also</u> <u>Cotto L. Grp., LLC v. Benevidez</u>, 870 S.E.2d 472,

480 (Ga. Ct. App. 2022) ("Thus, it is reversible error to decline to award attorney fees where a default judgment has been entered on a complaint that specifically seeks attorney fees under O.C.G.A. § 13-6-11."). Plaintiff specifically sought attorneys' fees in its Complaint and Amended Complaint. Moreover, the Amended Complaint plausibly alleges that Shanklin acted in bad faith, was stubbornly litigious, and caused Plaintiff unnecessary trouble an expense by refusing to fulfill his contractual obligations with no excuse for his failure. Accordingly, Defendant is liable for Renewal's expenses of this litigation including reasonable attorneys' fees under O.C.G.A. § 13-6-11. Through affidavit of counsel, Renewal has established that it has accrued at least $████████.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Renewal's Motion for Default Judgment. Accordingly, the Court **AWARDS** Plaintiff $████████ in damages in connection with Plaintiff's claim for breach of contract. Pursuant to O.C.G.A. §§ 7–4–2, –15, the Court **AWARDS** Plaintiff prejudgment interest of $████████. The Court also **AWARDS** Plaintiff a total of $████████ for attorney fees and costs.

Thus, the judgment against Shanklin totals $122,734.02.[3] The Clerk is **DIRECTED** to enter judgment for Plaintiff and against Defendant in this amount and to **CLOSE** this case.

**SO ORDERED**, this 5th day of February, 2024.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[3] Under O.C.G.A. § 7–4–12(a), post-judgment interest shall bear on the total sum awarded to Plaintiff at the rate of 11.5% per year, compounded annually, from and after the date of the Final Default Judgment until it is satisfied in full.